IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHRISTINE GUILLEN,                        )
                                          )
        Plaintiff,                        )
                                          )
    v.                                    )        1:19-cv-1206 (LMB/IDD)
                                          )
MARK ESPER, SECRETARY OF DEFENSE,         )
                                          )
        Defendant.                        )

MEMORANDUM OPINION

    Through counsel, plaintiff Christine Guillen ("Guillen" or "plaintiff"), an Asian woman of

Cambodian descent, has filed a three-count Amended Complaint under Title VII of the Civil

Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., against her former employer the

Defense Logistics Agency, Defense Energy Support Center ("DLA" or "defendant"[1]), a combat

support agency within the Department of Defense. The Amended Complaint alleges that defendant

discriminated against plaintiff based on her race and national origin (Count I), retaliated against

her (Count II), and created a hostile work environment based on her race and national origin

(Count III). Defendant has filed motions to dismiss the Amended Complaint under Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6), which have been fully briefed by both parties. For the

reasons explained in this Memorandum Opinion, the motion to dismiss for failure to state a claim

will be granted and this civil action will be dismissed with prejudice.[2]

---

[1] The Amended Complaint names Secretary of Defense Mark Esper as the defendant because the
Secretary of Defense is the proper defendant for all Title VII claims against the Department of
Defense; however, for purposes of this Memorandum Opinion, the Court will refer to the
component of the Department of Defense for which plaintiff worked as "defendant."

[2] Having found that oral argument would not further the decisional process, the motion to dismiss
has been decided on the papers submitted.

I.    Procedural history

This is plaintiff's second complaint. Her first complaint, which included counts under the

Rehabilitation Act and the Family and Medical Leave Act ("FMLA") in addition to the Title VII

counts at issue in the instant complaint, was dismissed on January 17, 2020. The FMLA claims

were dismissed without prejudice because the Court lacked jurisdiction over them, and the

Rehabilitation Act claim was dismissed with prejudice because amendment would have been

futile. Although plaintiff's Title VII claims were inadequately pleaded, those claims were

dismissed without prejudice and plaintiff was given leave to file an amended complaint solely as

to those claims. Because the original complaint was difficult to evaluate due to its failure to

include a clear timeline of events, plaintiff's counsel was strongly advised in open court that any

amended complaint should remedy that problem. In particular, the Court advised counsel about the

need to use specific dates and make the chronology of events clear. The Order dismissing

plaintiff's initial complaint explicitly stated that should plaintiff wish to file an amended complaint

as to her Title VII claims, she must do so "in a more precise manner." [Dkt. No. 25].

Despite this admonition, as the defendant points out, plaintiff's Amended Complaint

suffers from most of the same infirmities as her first complaint. Most significantly, the complaint

remains very difficult to follow because it does not include a clear chronology of events. Many of

the events described in the complaint are undated, leaving the Court to guess when they may have

occurred. For example, although the Amended Complaint alleged that plaintiff filed "complaints"

with the DLA Equal Employment Opportunity ("EEO") Office, the only protected activities

described are plaintiff's report of her first-level supervisor's allegedly sexist comment to her

second-level supervisor at some unspecified time, and plaintiff's filing an EEO complaint at some

unspecified time in 2016. See Am. Compl. [Dkt. No. 26] ¶¶ 3, 19, 97 ("In 2016, Plaintiff filed an

EEO complaint.") ("Guillen engaged in protected activity when she made EEO complaints about

  
the discrimination, harassment, hostile work environment, and retaliation she was suffering.").
This lack of clarity would be troublesome in any complaint, but it is particularly problematic in the
context of a retaliation claim, because the viability of the plaintiff's allegations depends on
whether she has plausibly alleged a causal relationship between her protected activity and any
adverse action she claims to have suffered as a result of engaging in that protected activity.[3]

Unlike many complaints that are as poorly drafted as this one, plaintiff is not proceeding
pro se; indeed, she has been represented by the same counsel since at least March 30, 2017, when
plaintiff's counsel was listed as plaintiff's representative on a pre-complaint intake form filed with
the DLA EEO Office.[4] That intake form included an attachment, apparently drafted by plaintiff,
which listed some of the specific dates on which various events occurred. Accordingly, plaintiff's
counsel has been on notice of the timeline of events in this matter for more than three years, and
there is simply no excuse for the Amended Complaint's jumbled and incomplete chronology of
those events.

---

[3] Another example of the Amended Complaint's confusing chronology relates to plaintiff's efforts
to obtain a promotion to a GS-12 level. Although Paragraphs 22 and 23 of the Amended
Complaint describe plaintiff's efforts to obtain a promotion, paragraph 23 also states that
plaintiff's supervisor "changed [] Guillen's standards 30 days before her promotion to GS-12,
which left her little to no time to meet the standards." Am. Compl. ¶ 22-23. The next paragraph of
the complaint jumps forward in time, stating that "[o]nce [] Guillen was promoted," her supervisor
"began to nitpick her work consistently and harass her with daily emails." Id. ¶ 24. No explanation
is given of when or how plaintiff was promoted. A few paragraphs later, in paragraph 26, the
complaint jumps back in time again, stating that "[o]n May 20, 2016, when [] Guillen asked about
her GS-12 promotion, [her supervisor] stated that she did not believe [] Guillen was ready for it."
Id. ¶ 28. The Amended Complaint is replete with similar examples of garbled or confusing
chronology. It also contains many sections which appear to be copy-pasted verbatim from the
original complaint. See, e.g., id. ¶¶ 3-4, 8-9, 11, 13-18, 20, 21-30, 33-34, 36-45, 47, 51-52, 55-59,
61-68, 70-108.

[4] The intake form was not attached to the Amended Complaint, but was attached to defendant's
motion to dismiss.

To better understand the possible scope of plaintiff's claims for purposes of the background section of this Memorandum Opinion, the Court has given plaintiff the courtesy of incorporating dates discussed in the attachments to defendant's motion to dismiss and plaintiff's opposition to that motion;[5] however, it "is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Marsh v. Virginia Dept. of Transp., No. 6:14-cv-6, 2014 WL 6833927, at *8 (W.D. Va. Dec. 3, 2014). Accordingly, although the chronology of events described below has been clarified by reference to these other documents, they do not save the Amended Complaint from dismissal.

The Amended Complaint also suffers from other deficiencies. For example, the Amended Complaint continues to reference plaintiff's disability and assert that she suffered discrimination on that basis, even though plaintiff's Rehabilitation Act and FMLA claims have been dismissed. See, e.g., Am. Compl. ¶¶ 6, 7 ("Guillen's disabilities affect one or more of her major life activities on a daily basis."); ("Guillen's doctor recommended that she be given the option to telework and be permitted to work under a different supervisor. Plaintiff petitioned her supervisors for these accommodations based on her medically documented disabilities."). Despite these repeated references throughout the Amended Complaint to plaintiff's disability, the Amended Complaint does not reassert either her Rehabilitation Act or FMLA claims. Accordingly, these extraneous allegations will be ignored.

The Amended Complaint also includes a number of internal inconsistencies. For example, it includes the following allegation: "While [plaintiff's supervisor] did not provide any verbal or

---

[5] Using these attachments to evaluate the motion to dismiss is proper, because courts "may consider documents attached to the complaint . . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Sec'y of State For Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

written feedback on [] Guillen's work, she sent her harassing and nitpicking emails daily where she accused [] Guillen of not doing things correctly." Id. ¶ 21. This assertion, like several others in the Amended Complaint, is contradictory: plaintiff cannot plausibly claim that she received no written feedback, and in the same paragraph complain that her supervisor sent her written emails correcting her work, which constitutes "feedback" by any definition. Similarly, although the Amended Complaint asserts that plaintiff's supervisor told her that it would be difficult for her to get a promotion to a GS-13 position "because [she was] a woman," id. ¶ 3, the Amended Complaint goes on to state that that very same supervisor "hand select[ed]" two women for GS-13 promotions, id. ¶ 25.

The lack of detail, multiple inconsistencies, and extraneous information have made evaluating plaintiff's claims more difficult; however, for the reasons discussed below, her Amended Complaint fails not simply because it is challenging to understand, but because it has not stated any claim under Title VII.

## II.   Factual background

The Amended Complaint describes plaintiff as an Asian woman of Cambodian descent who served as a Logistics Management Specialist at DLA's Defense Energy Support Center in Fort Belvoir, Virginia from February 23, 2015 to October 24, 2017. Am. Compl. ¶ 2. During her tenure at DLA, she was the only person of her race and national origin working in her office. Id. Plaintiff was initially employed either at the GS-9 or 11 level. Id. ¶ 20 ("Guillen expressed her concerns about only being a GS-9/11."). During plaintiff's tenure with DLA, her immediate supervisor was Debra Simpson, and her "second-level supervisor" was Eric Wiedemann. Id. ¶¶ 3, 17. Plaintiff alleges that she received a "fully successful" rating during her first two performance evaluation cycles in this position. Id. ¶ 61.

At some unspecified time in 2015, during a performance evaluation, plaintiff expressed interest in being promoted to a GS-13 position, to which Simpson allegedly responded that plaintiff would have a difficult time getting the promotion "because [she was] a woman." Id. ¶ 3. On an unspecified date, plaintiff reported this statement to Wiedemann, but "he denied her the promotion opportunity, as well." Id.

In June or July 2015, Simpson asked Guillen to oversee DLA's Army team and assist with the Air Force team. Id. ¶ 20. Simpson told Guillen that the person performing those tasks, a "Mr. Hundley," "was not performing at a GS-13 level and that [Simpson] needed [] Guillen to make sure the Army team was back on track." Id.[6] "When [] Guillen expressed her concerns about only being a GS-9/11, [] Simpson told her that she trusted her work and that [someone named Ms. Pope] had trained her well to the point where she would be able to assist and oversee a team as a Team Lead." Id.

In September 2015, Guillen asked Simpson "what was expected of employees in order to be considered for a GS-12 position," and Simpson explained the requirements. Id. ¶ 22. Guillen claims she took steps to accomplish all of the requirements, including becoming a team lead. Id. "[A]s evidence of [Guillen] exceeding expectations," Simpson assigned her to train two other people. Id. The complaint alleges that despite Guillen's efforts, Simpson attempted to sabotage her promotion by "chang[ing] [] Guillen's standards" thirty days before the scheduled promotion, "which left her little to no time to meet the standards." Id. ¶ 23.

---

[6] Throughout the complaint, plaintiff identifies a variety of individuals who she claims are her "non-Asian" comparators. The individuals named are Tavis Hundley, Datoya Taylor, Alison Silverio-Adams, Katherine Gardner, Laura Funk, Lance Gross, and Chanel Pittman. Although the Amended Complaint describes some of these individuals as "team leads" or "team members," it does not provide the official job titles for any of these individuals. The complaint also does not identify the GS-levels of most of these individuals, except that Hundley is identified as a GS-13, and the complaint states that Funk and Silverio-Adams were promoted to the GS-13 level at some point in 2016.

The Amended Complaint alleges that other employees were given benefits that were not offered to Guillen. For example, the complaint alleges that Guillen discovered in April 2016 that non-Asian employees Alison Silverio-Adams and Datoya Taylor were permitted to "do temporary duty ('TDY')," while Guillen was not. Id. ¶ 27.[7] The Amended Complaint contends that Guillen was told she was not allowed to "do TDY" because she has children, even though Taylor also has children but was nonetheless allowed to "do TDY." Id. The Amended Complaint further alleges that Silverio-Adams was allowed to take her physical fitness time at the end of the day without finishing her work, while Guillen was required to finish her Unliquidated Obligations[8] before going to the gym, and Simpson "ensured that more work was distributed to [] Guillen, so that she would not be able to take her physical fitness time." Id. ¶ 29.

On May 20, 2016, Guillen again inquired about promotion to a GS-12 level. Id. ¶ 28. Simpson responded that she did not believe Guillen was ready for it, because she was "performing at a GS-11 level fine but was not worthy to take on a GS-12 role." Id. The complaint alleges that this statement was clearly false, because Simpson routinely held Guillen to GS-13 standards, which she met or exceeded, even "outperforming and correcting the work of Mr. Hundley, who was a GS-13." Id.

Although the Amended Complaint is unclear as to the chronology, it appears that despite Simpson's statements, Guillen was indeed promoted to the GS-12 level at some point in July 2016. Id. ¶ 24; [Dkt. No. 29-5] at 6. Guillen alleges that after that promotion, Simpson began to "nitpick her work consistently," "harass her with daily emails," "observe[] her under a microscope," give her "impossible tasks," and assign her the same workload as the GS-13s on her

---

[7] The Amended Complaint does not explain what temporary duty is, and does not allege that Guillen requested it.

[8] No definition of this term is provided.

team. Id. ¶¶ 24, 26. The Amended Complaint contends that this conduct was in response to Guillen's complaint to Wiedemann about "the gender based promotion issues with [] Simpson." Id.[9]

In general, the Amended Complaint alleges that Simpson was harder on Guillen than on others. As examples of this contention, the Amended Complaint describes Simpson as threatening to "get" Guillen for "timecard fraud" after Guillen forgot to code a timesheet, even though other employees did the same thing without being chastised; demanding on July 6, 2016 that Guillen complete her "slides" more quickly than other employees, even though Guillen was returning from sick leave; and asking Guillen, but not others, on July 13, 2016 to complete seating charts and arrangements for a meeting, but then refusing to copy Guillen on a subsequent email about the meeting, even though all other team members were included on the email. Id. ¶¶ 30-32.

On July 29, 2016, Guillen submitted a request for "full-time telework" to "stay away from [her] supervisor and the stressful environment." Id. ¶ 37. Simpson denied this request but "temporarily moved [p]laintiff up to the fourth floor, which [p]laintiff believes to be a form of punishment."[10] Id. ¶ 40. When Simpson moved Guillen back down to her regular floor, "she moved her desk to the other side of the office secluding her from everyone else on her team." Id. ¶ 41. Guillen followed up her initial request to telework with four other requests on August 25, 2016, October 6, 2016, March 30, 2017, and July 20, 2017, three of which were requests for a different supervisor, and one of which was a request to "transition to a different work

---

[9] As discussed above, the Amended Complaint does not make clear when plaintiff made this complaint to Wiedemann.

[10] Guillen provides no explanation for why she considered being moved to a different floor, away from Simpson, to be a punishment, when Guillen had specifically requested to "stay away" from Simpson.

environment." Id. ¶ 37.[11] Simpson allegedly denied these requests without providing a written statement supporting her decision, which plaintiff claims violated DLA's handbook. Id. ¶ 38.

The Amended Complaint alleges that in 2016, Guillen filed a formal EEO complaint alleging discrimination based on race and sex.[12] [Dkt. No. 29-4] at 6. Although the Amended Complaint does not specifically allege that any of Guillen's supervisors were aware of this complaint, it alleges "that things got much worse for [] Guillen after she filed the EEO complaint," and that Simpson "targeted [] Guillen for poor treatment and did not treat any of her subordinates the way she treated [] Guillen." Am. Compl. ¶ 56, 59. Specifically, Guillen alleges that Simpson's behavior included the following:[13]

- on an unspecified date in 2016, "discriminat[ing] against [] Guillen by hand selecting two of [] Guillen's non-Asian comparators, Laura Funk and Alison Silverio-Adams, for GS-13 promotions positions without internal competition or posting a job announcement," despite Simpson's awareness of Guillen's interest in a GS-13 position, id. ¶ 25;
- on an unspecified date in August 2016, falsely accusing Guillen of taking two-hour lunch breaks, telling Guillen that she could only take a half hour lunch break, and requiring Guillen to notify Simpson when she took lunch after 1:00 pm, even though other employees were not subject to this policy; id. ¶ 45-47;
- on October 13, 2016, changing "the team standard for detailed notes" without informing Guillen, but nonetheless holding Guillen "accountable to the new standard," id. ¶ 33;
- on October 13, 2016, excluding Guillen from a meeting, id.;
- on unspecified dates, telling other team members to monitor and provide summaries of Guillen's work, while not imposing similar monitoring on other employees, id. ¶ 43, 54;

---

[11] The Amended Complaint does not specify what plaintiff meant by "transition to a different work environment."

[12] The Amended Complaint does not specify when in 2016 this EEO complaint was filed. A document produced by the EEO Office, which is attached to the motion to dismiss, states that this EEO complaint was filed on August 23, 2016, [Dkt. No. 29-4]; however, plaintiff's opposition to the motion to dismiss states that this complaint was filed on August 12, 2016, and that plaintiff "spoke to a DLA EEO officer" in July 2016. [Dkt. No. 35] at 2.

[13] Many of these allegations are not dated, and it is therefore not possible to determine whether they occurred before or after plaintiff's EEO complaint in August 2016.

- on unspecified dates, asking Guillen to complete work even though Simpson knew she was out on sick or medical leave, and "[w]hen [] Guillen could not complete the work, [making] sure she gave the job to other team members to make it seem like [] Guillen was a problem employee who was not willing to complete her work," id. ¶ 43;
- on unspecified dates, monitoring Guillen more closely than others during telework, and "harass[ing]" Guillen for not being logged on to DLA's online communication platform while teleworking, even though other employees did the same thing and were not criticized for it, id. ¶ 48;
- on unspecified dates, sending Guillen emails when she was tardy, and requiring her to take leave when she was late due to her Irritable Bowel Syndrome flareups, even though other employees were allowed to arrive late without taking leave or being disciplined, id. ¶¶ 49, 50;
- on an unspecified date, telling another team member that Guillen had reported that employee tardy, "which resulted in that team member shouting sarcastic remarks within the office to mock and embarrass" Guillen, id. ¶ 52;
- on unspecified dates, "sen[ding] emails to [p]laintiff to discredit and belittle her work ethic," id. ¶ 53;
- on unspecified dates, "publicly complain[ing] to her employees about [p]laintiff," and "yelling at [p]laintiff in front of them," id. ¶ 55;
- on unspecified dates, giving plaintiff more work than her colleagues, without taking into account her medical issues, id. ¶¶ 56, 57;
- on unspecified dates, "set[ting] unreasonable targets and timelines for [p]laintiff," but not other employees, id. ¶ 60;
- on unspecified dates, "singling out [Guillen] during meetings and trying to place blame on her for things she had not done," and being "unnecessarily 'nasty' and 'snarky'" with Guillen, id. ¶ 62; and
- on unspecified dates, going to Guillen's cubical to harass her, id. ¶ 64.[14]

The Amended Complaint further alleges that on unspecified dates, Wiedemann "ignor[ed]" Guillen when saying "good morning" to Simpson's staff. Id. ¶ 58.[15]

The EEO office investigated Guillen's 2016 EEO complaint and on April 16, 2018, issued its decision in which it found that Guillen had "failed to establish that she was subjected to

---

[14] The Amended Complaint suggests that Guillen's colleagues can corroborate some of Simpson's behaviors and attest to the quality of Guillen's work. See, e.g., id. ¶¶ 26, 56, 62-65, 72-73.

[15] On November 16, 2016, Guillen amended the EEO complaint she had filed in August 2016 to add an allegation that she was facing reprisal based on filing the initial complaint in August 2016. The Amended Complaint does not reference that amendment; however, it is mentioned in EEO documents attached to defendant's motion to dismiss and in plaintiff's opposition brief. [Dkt. No. 29-4] at 5 n.2; [Dkt. No. 35] at 2.

disparate treatment and harassment/hostile work environment . . . on the bases of sex and race" or that "she was subjected to reprisal." [Dkt. No. 29-4] at 5. Although the EEO Office gave plaintiff notice that she could appeal the Office's decision to the Equal Employment Opportunity Commission within 30 days, or file a civil action within 90 days, plaintiff did not seek further review of that complaint in federal court. Id. at 18.

On February 13, 2017, Simpson gave Guillen an "unsuccessful" performance review, and the next day, placed her on a "Performance Improvement Plan" (PIP) "to get rid of her." Am. Compl. ¶¶ 61, 65-66. Simpson also "took away [Guillen's] telework and fitness time," which the Amended Complaint alleges was unfair because three other team members were permitted to telework at least two days per week, and Guillen was the only team member prohibited from teleworking. Id. ¶¶ 66, 69.[16] At some point in late February 2017, plaintiff submitted leave slips for medical leave, which Simpson denied. Id. ¶¶ 67-68. On February 17, 2017, plaintiff contacted a DLA EEO counselor regarding her issues with Simpson.[17]

At some point after the PIP was issued, "Simpson approached [p]laintiff at her desk and informed her that she wanted a one-on-one meeting with Human Resources. Plaintiff responded that she did not feel comfortable having a private meeting with no witnesses or union representatives. [] Simpson then stormed into [] Wiedemann's office." Id. ¶ 71.[18]

---

[16] This is a clear example of how plaintiff fails to identify appropriate comparators, as she fails to indicate whether or not these three team members had also been placed on PIPs after receiving unsuccessful performance reviews.

[17] This date does not appear in the complaint but is included in an EEO document attached to the motion to dismiss. [Dkt. No. 29-5] at 2.

[18] The Amended Complaint contends that an employee who witnessed this interaction told Guillen that Wiedemann and Simpson "tried to intimidate him" to ensure that "he would not testify about [] Simpson's inappropriate outburst towards [p]laintiff." Id. ¶ 73.

In March 2017, Guillen went to meet with Wiedemann about her progress under the PIP, but was surprised to see that another supervisor was present at the meeting. Id. ¶ 75. When Guillen requested that the meeting "be one-on-one and that the other supervisor not be present, or that a union representative or trusted employee also be present as a witness for her, [] Wiedemann denied her request . . . [and] subsequently marked her 'unsuccessful' for that work week despite her performing to standard." Id. ¶ 75.

On March 30, 2017, Guillen filed a pre-complaint intake form with the EEO office, which stated that she was represented by counsel. [Dkt. No. 29-5]. Again, the Amended Complaint fails to reference this filing or even to allege that Wiedemann was aware of it, but it alleges that on April 6, 2017, Wiedemann "began holding [] Guillen to different set of standards than her non-Asian . . . comparators," by requiring her to "produce project deliverables under very strict time constraints that were different from pre-established norms or the timelines that" comparator employees had to follow.  Am. Compl. ¶ 35.

On August 2, 2017, plaintiff received a Notice of Proposed Removal for Unacceptable Performance ("NPR"). Id. ¶ 10; [Dkt. No. 29-2]. Captain Christopher Light, who was new to the office, was appointed to be the "deciding official in the matter." Id. ¶ 77. The NPR, which is attached to defendant's motion to dismiss and which was signed by Wiedemann, [Dkt. No. 29-2], states that Wiedemann proposed to remove Guillen for "unacceptable performance" in various Critical Elements of her performance plan, including "[f]inancial [s]tewardship"; "[m]etrics [d]evelopment, [r]eporting, and [b]riefings"; and "[s]ervice [o]rders and PAMP [m]ailbox." Id. On the same day, August 2, 2017, Guillen filed a formal EEO complaint, which listed current counsel as her legal representative.[19]

_____

[19] The Amended Complaint does not include this specific date, but the date is listed in an EEO document attached to the motion to dismiss. [Dkt. No. 29-6].

12

On October 24, 2017, Light and Wiedemann informed Guillen that she was terminated. Id. ¶¶ 78-79. Light signed a document entitled "Notice of Decision – Removal," which stated that Light had "decided to remove [Guillen] from Federal service for unacceptable performance." [Dkt. No. 29-3]. The Amended Complaint alleges that "[p]rior to that time Captain Light never spoke to [p]laintiff." Id. ¶ 80.

The Amended Complaint alleges that "[a]s a result of the wrongful termination and negative mark on her record, [] Guillen has not been able to find comparable employment in the federal government despite applying for 37 government jobs, one local government job, and 102 private industry jobs," that she has suffered "mentally, emotionally, physically, and financially," and that her family relationships, mental health conditions, and IBS symptoms have worsened as a result of DLA's actions. Id. ¶¶ 81-85.

On December 7, 2017, Guillen supplemented her August 2, 2017 EEO complaint to include allegations relating to her removal.[20] On January 2, 2018, the EEO Office informed plaintiff, through counsel, that the scope of her complaint was limited to the following claims: (1) whether plaintiff was discriminated against based on sex,[21] disability, race, or national origin, or retaliated against when (a) she received an unsuccessful performance rating on February 13, 2017; (b) she was not given a cash award on March 22, 2017;[22] (c) DLA denied her request to move to a different supervisor on June 22, 2017; (d) DLA proposed to remove plaintiff from federal service on August 2, 2017 and (e) plaintiff was removed from federal service on October 24, 2017; and

[20] This date is not included in the Amended Complaint, but is referenced in an EEO document attached to the motion to dismiss. [Dkt. No. 29-7].

[21] Although plaintiff included a sex discrimination claim in her EEO complaint, she has not pursued that claim in this litigation.

[22] The Amended Complaint does not include an allegation about defendant's failure to give plaintiff a cash award in March 2017. Accordingly, that allegation will not be considered.

(2) whether plaintiff was subjected to a hostile work environment based on sex, disability, race, national origin, or retaliation between November 2016 and August 2, 2017 with respect to "time and attendance, work products and performance, and being complained about and yelled at in public." [Dkt. No. 29-7]. In accepting plaintiff's complaint, the EEO office explicitly gave plaintiff the opportunity to amend or correct the list of claims under consideration. Id. Plaintiff took advantage of this opportunity once, by adding a claim relating to her termination, but she did not add any other claims or amend any of the original claims.

On September 18, 2019, before the EEO Office issued its decision, Guillen filed her first complaint in this court.[23] In this civil action, plaintiff seeks a declaratory judgment; compensatory damages; past and future pecuniary damages including back pay and front pay; emotional distress damages; liquidated damages; remuneration and privileges of employment retroactive to the date of unlawful discrimination; attorneys' fees and costs; and pre- and post-judgment interest. Am. Compl. at 18-19.

### III.    Standard of review

Defendant has moved to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1), on the ground that the Court lacks subject matter jurisdiction over those claims that have not been administratively exhausted. "The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction." U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 348 (4th Cir. 2009) (internal citation omitted).

---

[23] Although the EEO Office did not issue the final agency determination until October 7, 2019, plaintiff's filing of her initial complaint appears to have been proper under the relevant regulations, which provide that an agency shall dismiss an EEO complaint "[t]hat is the basis of a pending civil action in a United States District Court in which the complainant is a party provided that at least 180 days have passed since the filing of the administrative complaint." 29 C.F.R. § 1614.107(a)(3). Plaintiff's first complaint in this court was filed more than 180 days after she filed her EEO complaint.

Defendant has also moved for dismissal of all three of plaintiff's claims under Rule 12(b)(6), on the ground that the Amended Complaint "fail[s] to state a claim upon which relief can be granted." Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). "Therefore, in order for a . . . complaint to survive dismissal for failure to state a claim, the plaintiff must allege facts sufficient to state all of the elements of [his or] her claim." Lucas v. Henrico Cty. Sch. Bd., 822 F. Supp. 2d 589, 600 (E.D. Va. 2011) (internal quotation marks and citations omitted). "[A] [p]laintiff[] cannot satisfy this standard with [a] complaint[] containing labels and conclusions or a formulaic recitation of the elements of a cause of action." Id. "Instead, a plaintiff must allege facts sufficient to raise a right to relief above the speculative level, . . . stating a claim that is plausible on its face, . . . rather than merely conceivable. Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In evaluating a motion to dismiss under Rule 12(b)(6), "a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff," id.; however, "legal conclusions pleaded as factual allegations, unwarranted inferences, unreasonable conclusions, and naked assertions devoid of further factual enhancement are not entitled to the presumption of truth." Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017).

## IV.   Analysis

Although the complaint includes a litany of allegations about Simpson and Wiedemann's behavior from 2015 until plaintiff's termination, defendant argues that many of these allegations are not properly before the Court and must be dismissed under Rule 12(b)(1). Specifically, defendant correctly points out that only those claims which were properly exhausted before the

DLA EEO Office may be considered.[24] "Federal employees bringing Title VII claims must

exhaust administrative remedies within their federal agency before filing in federal court."

McLaughlin v. Barr, No. 1:19-cv-318, 2020 WL 869914, at *3 (M.D.N.C. Feb. 21, 2020) (citing

29 C.F.R. § 1614.105-1614.110). The exhaustion requirement is not "simply a formality to be

rushed through so that an individual can quickly file his subsequent lawsuit." Chacko v. Patuxent

Inst., 429 F.3d 505, 510 (4th Cir. 2005). Instead, it advances the "twin objectives" of "protecting

agency authority in the administrative process and promoting efficiency in the resolution of

claims." Stewart v. Iancu, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations,

and citation omitted). "The requirement of administrative exhaustion limits the scope of a

plaintiff's federal lawsuit in that it precludes a plaintiff from asserting claims in litigation that did

not appear in his [EEO] submission." Brown v. Bratton, No. 19-cv-1450, 2020 WL 886142, at *18

(D. Md. Feb. 21, 2020).

    The scope of issues which the Court may consider are limited by plaintiff's 2017 EEO

complaint to claims based on the following incidents: (1) plaintiff's February 13, 2017

unsuccessful performance rating;[25] (2) defendant's June 22, 2017 denial of plaintiff's request to

---

[24] Although plaintiff argues that the Court lacks jurisdiction to review those claims that were not properly exhausted, these arguments are more properly considered under a Rule 12(b)(6) motion to dismiss, because, as the Supreme Court recently held with respect to the analogous provision of Title VII applicable to non-federal employees, "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." Fort Bend Cty., Texas v. Davis, 139 S. Ct. 1843, 1851 (2019); see also Ryan v. McAleenan, No. 19-cv-1968, 2020 WL 1663172, at *14–15 (D. Md. Apr. 3, 2020) (applying Davis to federal employee). In this case, this is a distinction without a difference, because the exhaustion requirement remains "'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'" Id. (quoting Davis). Because defendant has properly and timely raised this issue, the exhaustion requirement will be applied to limit the scope of the claims that are properly before the Court.

[25] The EEO Office did not accept the February 14, 2017 PIP as one of plaintiff's claims; however, because plaintiff's 2017 EEO complaint clearly mentions the PIP, that claim will also be considered.

move to a different supervisor; (3) the notice of proposed removal issued on August 2, 2017; (4)

the alleged hostile work environment created by defendant's actions between November 2016 and

August 2017 with respect to "time and attendance, work products and performance, and being

complained about and yelled at in public"; and (5) plaintiff's removal from federal service on

October 24, 2017. [Dkt. No. 29-7].[26] Accordingly, only these incidents have been exhausted and

are properly before the Court.[27]

     To the extent plaintiff is arguing that other, earlier discrete incidents are properly before

the Court, this argument fails. The 2017 EEO complaint did not include claims based on

defendant's actions before November 2016. Although plaintiff brought claims based on certain

2016 incidents in her August 2016 EEO complaint, which was amended in November 2016, that

EEO complaint was resolved by a Final Agency Decision in April 2018 which found that plaintiff

---

[26] As discussed above, although the 2017 EEO complaint also included a claim related to defendant's failure to give plaintiff an award in March 2017, this claim was not reasserted in plaintiff's Amended Complaint, and accordingly will not be considered.

[27] Relying mainly on precedent from Title VII cases involving non-federal employees, defendant argues that of the incidents that have been exhausted, only plaintiff's removal from federal service constitutes an "adverse action" sufficient to state a claim for discrimination or retaliation. The merits of this argument are debatable. Plaintiff's claims are governed by 42 U.S.C. § 2000e-16, which is distinct from the Title VII provisions that apply to non-federal employees. Section 2000e-16 bars discrimination in "[a]ll personnel actions," which both the Supreme Court and the Fourth Circuit have suggested may encompass a broader range of actions than the comparable non-federal provision. See, e.g., Babb v. Wilkie, 140 S. Ct. 1168, 1173 (2020) (defining "personnel action" in the context of the Age Discrimination in Employment Act "to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews"); Caldwell v. Johnson, 289 F. App'x 579, 589 (4th Cir. 2008) ("[I]n § 2000e-16(a), Congress chose to regulate '[a]ll personnel actions.' Section 2000e-16(a) thus on its face covers a broader range of activity than does the private anti-discrimination statute, which must involve activity related to 'compensation, terms, conditions, or privileges of employment[.]' . . . . While, hiring and firing may represent the prototypical personnel action, many decisions involving human resources constitute personnel actions despite falling short of being 'ultimate employment decisions.'") (emphasis in original). This issue is not dispositive in this civil action, because even taking into account all of the incidents enumerated by the EEO Office, plaintiff has failed to state a claim.

was not entitled to any relief. The EEO Office informed plaintiff at that time that she could file a

lawsuit based on that EEO complaint in district court within 90 days, [Dkt. No. 29-4] at 18, but

plaintiff failed to do so, and she cannot belatedly resuscitate the claims from that EEO

complaint.[28] See Slate v. Potter, 459 F. Supp. 2d 423, 430 (M.D.N.C. 2006), aff'd, 365 F. App'x

470 (4th Cir. 2010); Lorenzo v. Rumsfeld, 456 F. Supp. 2d 731, 736–37 (E.D. Va. 2006), aff'd sub

nom. Lorenzo v. Gates, 225 F. App'x 165 (4th Cir. 2007) ("[T]he failure to comply with this [90-

day] filing deadline generally warrants dismissal of the complaint"). Moreover, plaintiff cannot

plead ignorance to the relevant deadline, because she was represented by counsel when she

received the Final Agency Decision, and therefore ought to have been aware of the timing

requirements. See [Dkt. No. 29-4] at 3 (sending copy of Final Agency Decision to plaintiff's

counsel and stating that "Your client is entitled to appeal this decision to the U.S. Equal

Employment Opportunity Commission or file suit in an appropriate U.S. District Court.

Procedures are set forth in this decision."). Accordingly, any claim based on the incidents included

in the August 2016 complaint or its November 2016 amendment is not properly before the Court.

Moreover, to the extent plaintiff is attempting to bring claims in this litigation based on

discrete acts occurring in 2015 and 2016 that were not included in her August 2016 complaint or

November 2016 amendment, plaintiff has not alleged in either her Amended Complaint or in her

opposition to the motion to dismiss that she exhausted the required administrative remedies with

respect to those actions. Specifically, there is no indication that plaintiff contacted an EEO

counselor "within 45 days of the date of the matter alleged to be discriminatory," as required

---

[28] Although "federal courts may still hear claims that the employee did not raise before the agency, as long as they are 'like or related' and grow out of the allegations during the pendency of the case before the agency," Stewart, 912 F.3d at 705, plaintiff has presented no case law suggesting that this doctrine applies to claims which a plaintiff brought in a separate administrative complaint but failed to timely pursue in federal court.

under the relevant regulations. 29 C.F.R. § 1614.105(a)(1); see also Guerrero v. Lynch, 621 F.

App'x 755, 756 (4th Cir. 2015). Although plaintiff contacted an EEO counselor on February 17,

2017, that was more than 45 days after the alleged activity in 2015 and 2016. Accordingly, claims

based on discrete acts occurring in 2015 and 2016 are not properly before the Court.[29]

    a.  Race and national origin discrimination claim (Count I)

Under 42 U.S.C. § 2000e-16, "[a]ll personnel actions" affecting federal employees "shall

be made free from any discrimination based on race . . . or national origin." The relevant "inquiry

is whether [plaintiff] alleges facts that plausibly state a violation of [this statute] above a

speculative level." Bing v. Brivo Sys., LLC, 959 F.3d 605, 616-17 (4th Cir. 2020) (internal

quotation marks and citation omitted).

The Amended Complaint is devoid of any factual, non-conclusory allegations of

discrimination based on race or national origin. The sole allegations in the complaint that could

conceivably support a claim of discrimination are that (1) plaintiff was the only Asian employee of

Cambodian descent in her office; and (2) conclusory statements that defendant gave preferable

treatment to other employees not of that racial and ethnic background. The Amended Complaint

includes no allegations that Simpson, Wiedemann, or any other DLA employee made any

statements about plaintiff's race or national origin, or otherwise exhibited any kind of racial

animus.[30] Nor does the Amended Complaint provide sufficient information about plaintiff's

---

[29] The timeframe for plaintiff's hostile work environment claim is somewhat different. Although November 2016 was more than 45 days before February 17, 2017, the EEO Office nonetheless accepted plaintiff's claim of a hostile work environment from November 2016 to August 2017. Accordingly, that claim is properly before the Court.

[30] There is no bright line rule that a complaint must allege specific instances of clear racial- or national origin-based animus to survive a motion to dismiss. Discrimination takes many forms, and the mere fact that an employee has not been called a racial slur or subjected to other blatant disparate treatment is not dispositive. The dismissal of plaintiff's discrimination claim is based on

alleged "comparators" to enable the Court to infer that such employees were in fact similarly situated, or provide any other facts suggesting that plaintiff's treatment was based on her race or national origin. As such, plaintiff effectively asks the Court to presume that because she was the only Asian employee of Cambodian descent in her office, any criticism or discipline she received must necessarily have been based on her race or national origin. This assumption is insufficient to survive a motion to dismiss. "[N]aked assertions devoid of further factual enhancement are not entitled to the presumption of truth." Wikimedia, 857 F.3d at 208. Moreover, "[b]eing aware of no alternative explanation and guessing that conduct is racially motivated does not amount to pleading actual facts to support a claim of racial discrimination," and constitutes mere "speculation," which impermissibly requires a court to "fill in the gaps" as to a defendant's motivation. Bing, 959 F.3d at 618.

Even to the extent that Simpson or Wiedemann's treatment of plaintiff could be construed as consistent with discrimination, "[t]he mere fact that a certain action is potentially consistent with discrimination does not alone support a reasonable inference that the action was motivated by bias." Id. Notably, although plaintiff references various other employees and claims that they can corroborate that Simpson and Wiedemann treated her poorly or discriminated against her on some unspecified basis, she does not allege that any of those employees believed that her poor treatment was in any way related to her race or national origin. Because plaintiff has failed to plead any specific facts supporting her claim of race or national origin-based discrimination, her complaint

---

her failure to plead any facts supporting an inference of discrimination, including her failure to identify true comparators.

"stops short of the line between possibility and plausibility of entitle[ment] to relief."[31] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) (internal quotation marks and citations omitted).

Consistent with this standard, courts in the Fourth Circuit have routinely dismissed Title VII claims in which the plaintiffs alleged race discrimination without providing sufficient factual allegations to support such a claim, apart from a general, unsupported assertion that employees of a different race were treated more favorably. See, e.g., McCleary-Evans v. Md. Dep't of Trans., 780 F.3d 582, 586 (4th Cir. 2015) ("While [plaintiff] did allege that the [defendant] failed to hire her, she did not allege facts sufficient to claim that the reason it failed to hire her was because of her race."); Dangerfield v. Johns Hopkins Bayview Med. Ctr., Inc., No. 19-cv-155, 2019 WL 6130947, at *3 (D. Md. Nov. 19, 2019) ("There is nothing in [plaintiff's] allegations, absent the fact that she was the only African American female employed by Defendant in her department, that suggests the actions [plaintiff] complains of were based on her race.").

In addition, the Amended Complaint relies heavily on comparisons with alleged "comparators," without providing sufficient information to enable the Court to conclude that those individuals were in fact similarly situated. Although pointing to a similarly situated comparator is not required to succeed on a discrimination claim, Haywood v. Locke, 387 Fed.App'x. 355, 359 (4th Cir. 2010), should a plaintiff choose to rely on comparators, she must "establish a plausible basis for believing [the employees were] actually similarly situated." Robinson v. Loudon Cty. Pub. Sch., No. 1:16-cv-1604, 2017 WL 3599639, at *4 (E.D. Va. Aug. 18, 2017). "Because two coworkers treated differently for the same offense might not be similarly situated if they have different job responsibilities or circumstances, a complaint that merely alleges a co-worker is similarly situated without providing facts to substantiate that similarity fails to state a claim for

---

[31] This same conclusion would hold even if the Court were to consider all factual allegations in the complaint, including those that are untimely or were not properly exhausted.

discrimination." Booth v. Cty. Exec., 186 F. Supp. 3d 479, 486 (D. Md. 2016). The Fourth Circuit

has affirmed dismissal of discrimination claims where the plaintiff named a comparator outside

the protected class who was allegedly treated more favorably, but failed "to establish a plausible

basis for believing [the comparator and plaintiff] were actually similarly situated or that race was

the true basis for [plaintiff's] termination." Coleman v. Maryland Court of Appeals, 626 F.3d 187,

191 (4th Cir. 2010), aff'd on other grounds, 566 U.S. 30 (2012).

 Plaintiff has provided virtually no details about the specific job titles, responsibilities, or

qualifications of the individuals she identifies as her comparators. To the extent plaintiff has

provided information about her alleged comparators, that information indicates that those

individuals may not in fact have been similarly situated. For example, plaintiff states that alleged

comparator Tavis Hundley worked at a GS-13 level, while plaintiff's highest level was GS-12.

Accordingly, the Amended Complaint's references to potential comparators do nothing to support

plaintiff's discrimination claim.

 Although dismissal without prejudice can be an appropriate remedy in some cases, the

Court already dismissed plaintiff's first complaint without prejudice, and the Amended Complaint

did nothing to remedy the issues in the first complaint, which makes clear that allowing additional

amendments would be futile. See Grant v. U.S. Dep't of Def., No. 1:18-cv-1149, 2018 WL

9814671, at *1 (E.D. Va. Sept. 12, 2018) ("[D]ismissal with prejudice is appropriate where it is

obvious that the plaintiff cannot prevail on the facts [s]he has alleged and [that] it would be futile

to give h[er] an opportunity to amend.") (internal quotation marks and citation omitted). Plaintiff

has already been granted a second bite at the apple; there is no justification for granting her a third.

Accordingly, this claim will be dismissed with prejudice.

b.  Retaliation claim (Count II)

To state a prima facie case of retaliation,[32] a plaintiff must allege "that (1) the plaintiff

engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted

adversely against the plaintiff; and (3) the protected activity was causally connected to the

employer's adverse action." Ryan, 2020 WL 1663172, at *20 (internal quotation marks and

citations omitted). Logically, to establish a causal link between protected activity and adverse

action, the protected activity must have occurred before the relevant adverse action.

The only specific protected activities that are mentioned in the Amended Complaint are

plaintiff's complaint to Wiedemann on an unspecified date that Simpson had told her it would be

difficult for her to get a promotion because she is a woman and plaintiff's filing an EEO complaint

in 2016. Am. Compl. ¶ 97. The only potentially adverse actions that are properly before the Court

are: (1) plaintiff's February 13, 2017 unsuccessful performance rating; (2) defendant's June 22,

2017 denial of plaintiff's request to move to a different supervisor; (3) the notice of proposed

removal issued on August 2, 2017; (4) the alleged hostile work environment created by

defendant's actions between November 2016 and August 2017 with respect to "time and

attendance, work products and performance, and being complained about and yelled at in public";

---

[32] A plaintiff is not required to establish a prima facie case to survive a motion to dismiss, see
Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-15, (2002); however, the factual allegations
must "be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555.
Accordingly, at the motion to dismiss stage, "the Court looks to the elements of a prima facie case
but does not require proof of the elements, only plausibility." Robinson, 2017 WL 3599639, at *3.

[33] (5) plaintiff's removal from federal service on October 24, 2017; and (6) plaintiff's February 14, 2017 placement on a PIP.[34] [Dkt. No. 29-7].

Defendant argues that only plaintiff's removal qualifies as an adverse personnel action under the statute; however, even assuming that all of the above incidents are sufficiently adverse to qualify as "personnel actions," plaintiff has not adequately pleaded that there was a causal connection between her protected activity and any of those actions. With respect to plaintiff filing the August 2016 complaint, that protected activity was simply too far removed in time from the complained-of adverse actions to satisfy the causation requirement. "Courts have found that large temporal gaps, without other evidence, are insufficient to establish an inference of causation between the adverse employment action and the protected activity." Adkins v. Fairfax Cty. Sch. Bd., No. 1:08-cv-91, 2008 WL 2076654, at *6 (E.D. Va. May 15, 2008), aff'd, 297 F. App'x 202 (4th Cir. 2008). Although neither the Fourth Circuit "nor the Supreme Court have adopted a bright temporal line, [the Fourth Circuit has] held that a three- or four-month lapse between the protected activities and discharge was too long to establish a causal connection by temporal proximity alone," and "[e]ven a mere ten-week separation between the protected activity and termination is sufficiently long so as to weaken significantly the inference of causation between the two events." Perry v. Kappos, 489 F. App'x 637, 643 (4th Cir. 2012) (internal quotation marks and citations omitted). Plaintiff's 2016 complaint was filed approximately three months before the beginning of

---

[33] These actions were only accepted by the EEO office as part of plaintiff's hostile work environment claim, not her retaliation claim; however, the Court will give plaintiff the benefit of the doubt and consider these actions as part of her retaliation claim as well as her hostile work environment claim.

[34] As discussed above, the EEO Office did not accept the PIP as one of plaintiff's claims; however, because plaintiff's 2017 EEO complaint clearly mentions the PIP, that incident will also be considered.

the first potentially adverse action, six months before her unsuccessful performance rating, and more than a year before her removal from federal service.

The complaint does not specify when plaintiff complained to Wiedemann about Simpson's gender-based comment, which makes it impossible to tell whether that complaint could plausibly have any causal link to any subsequent adverse action; however, because plaintiff alleges that Simpson made the offensive comment at some point in 2015, it is reasonable to presume that plaintiff reported that comment to Wiedemann in 2015. If that is the case, that activity was even more removed in time from the relevant adverse actions than plaintiff's 2016 complaint, which further undermines any causal relationship. Accordingly, plaintiff fails to state a retaliation claim based on temporal proximity. Nor has she alleged other facts that would support an inference of causation, or that would render her retaliation claim plausible, rather than merely conceivable.

Because the complaint only specifically mentions these protected activities, the Court's analysis could stop there; however, the same conclusion holds even if the Court considers all of the instances in which plaintiff appears to have engaged in protected activity, including those that were not explicitly mentioned in the complaint or that were referenced only generically as "EEO complaints" without including specific dates. Am. Compl. ¶ 97. Specifically, although the opposition to the motion to dismiss indicates that plaintiff amended her EEO complaint in November 2016, that amendment is also too temporally removed from the relevant adverse actions to satisfy the causation requirement. In addition, although it appears that plaintiff contacted an EEO counselor on February 17, 2017, filed a pre-complaint intake form on March 30, 2017, and filed an EEO complaint on August 2, 2017, those protected activities occurred after plaintiff received an unsuccessful performance rating on February 13, 2017 and was placed on a PIP on February 14, 2017, which demonstrates that defendant was already displeased with plaintiff's performance and was seriously considering taking adverse action against her before plaintiff

engaged in that protected activity. "Employers need not suspend previously planned [actions] upon discovering [plaintiff's EEO activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). Accordingly, even if these additional protected activities had been mentioned in the Amended Complaint, they would not alter the conclusion that plaintiff has not stated a retaliation claim.

Finally, plaintiff's retaliation claim with respect to her termination fails for the independent reason that she has not adequately alleged that Captain Light, who was the "deciding official" with respect to her termination, was aware that she engaged in protected activity. "[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the causation element of a retaliation claim because, by definition, an employer cannot take action because of a factor of which it is unaware." Smyth-Riding v. Scis. & Eng'g Servs., LLC, 699 F. App'x 146, 153 (4th Cir. 2017) (internal quotation marks and citation omitted). Notably, the Amended Complaint states that Captain Light was "new to the office as of August 2017" and had never spoken to plaintiff before the meeting in which she was terminated. Although the Amended Complaint generically states that "[d]efendant was aware of the protected activity in which [] Guillen engaged," the complaint contains no allegations explicitly stating, or even implying, that Light, who was the ultimate decision maker, was aware of any of plaintiff's protected activity. Accordingly, the Court cannot reasonably infer that he had such awareness. For all these reasons, Count II will be dismissed.

c. Hostile work environment claim (Count III)

For the reasons Count I fails, Plaintiff's hostile work environment claim under Count III must also be dismissed. "[T]o state a claim under Title VII for a hostile work environment, a plaintiff must allege workplace harassment that: (1) was 'unwelcome'; (2) was based on a

protected characteristic [here, race or national origin]; (3) was 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere'; and (4) was, on some basis, 'imputable to the employer.'" Garrett v. Cape Fox Facilities Servs., No. 1:19-cv-579, 2020 WL 265869, at *6 (E.D. Va. Jan. 17, 2020) (quoting Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 302 (4th Cir. 2019)). Defendant persuasively argues that plaintiff has not met the second element.

As the Fourth Circuit has held, "only harassment that occurs because of the victim's . . . [protected class] is actionable." Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 772 (4th Cir. 1997) (emphasis added). Plaintiff has not adequately alleged that any harassment she experienced was because of her race or national origin. Although the complaint includes "a laundry-list of [plaintiff's] workplace grievances," Green v. Sessions, No. 1:17-cv-1365, 2018 WL 2025299, at *11 (E.D. Va. May 1, 2018), there are no allegations from which one could reasonably infer that any of plaintiff's grievances have any connection whatsoever to plaintiff's race or national origin. The complaint recites the elements of a hostile work environment claim in conclusory fashion, see Am. Compl. ¶ 107 ("Simpson and [] Wiedemann's conduct was based on [] Guillen's race and national origin and was sufficiently severe or pervasive when it altered the conditions of her employment and created an abusive and fearful work environment that was imputable to Defendant"); however, such conclusory statements are insufficient to survive a motion to dismiss. See Cole v. Hillside Family of Agencies, Inc., No. 10-cv-3326, 2011 WL 2413928, at *7 (D. Md. June 9, 2011). Moreover, although plaintiff alleges that Simpson frequently criticized and "nitpicked" her, a court "cannot jump from the mere existence of criticism to the conclusion that the criticism was . . . motivated [by race or national origin]." Webster v. Johnson, 126 F. App'x 583, 587-88 (4th Cir. 2005). The Fourth Circuit has made clear that a complaint cannot survive a motion to dismiss if it requires a court to "fill in the gaps" as to the basis for the alleged

27

discriminatory behavior. Bing, 959 F.3d at 618. That is precisely what plaintiff asks the Court to do here. At bottom, plaintiff has simply alleged the "kind of personality conflict that pervades many a workplace," Ziskie v. Mineta, 547 F.3d 220, 227 (4th Cir. 2008), rather than "personal racial attacks." [35] Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 191 (4th Cir. 2004).

Defendant has cited numerous cases in the Fourth Circuit in which the harassment, which was as extreme or more extreme than that at issue here, was not found to rise to the level of creating a hostile work environment. For example, the Fourth Circuit has affirmed dismissal of a claim in which a supervisor "mockingly" yelled at the plaintiff in a meeting, "yell[ed] and pound[ed] her hands on her desk during another meeting," "repeatedly harp[ed] on a mistake" by the plaintiff, "ma[de] snide comments" to the plaintiff, "play[ed] favorites with employees and pitt[ed] employees against each other," and "unfairly scrutiniz[ed] and criticiz[ed]" plaintiff's use of leave and lack of compliance with directives. Buchhagen v. ICF Int'l, Inc., 545 F. App'x 217, 219 (4th Cir. 2013). See also Hill v. Panetta, No. 1:12-cv-350, 2012 WL 12871178, at *9 (E.D. Va. Oct. 4, 2012), aff'd sub nom. Hill v. Hagel, 561 F. App'x 264 (4th Cir. 2014) (holding that allegations of yelling, excessive criticism, rudeness, and verbal abuse were insufficient to state a hostile work environment claim).

Complaints, like plaintiff's, that are "premised on nothing more than . . . callous behavior by [one's] superiors . . . or a routine difference of opinion and personality conflict with [one's] supervisor . . . are not actionable under Title VII." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (internal quotation marks and citations omitted). Because plaintiff's complaint does not allege treatment that objectively rises to the level of a hostile work

---

[35] This same conclusion applies even taking into account plaintiff's allegations of Simpson and Wiedemann's improper behaviors before November 2016, which were not included in her 2017 EEO complaint.

environment directed at plaintiff because of her race or national origin, this claim must be dismissed. Moreover, because amendment would not cure these defects, Count III will be dismissed with prejudice.

## V.   Conclusion

For the foregoing reasons, defendant's motion to dismiss for failure to state a claim will be granted, defendant's motion to dismiss for lack of jurisdiction will be denied, and plaintiff's Amended Complaint will be dismissed with prejudice by an Order that will be issued alongside this Memorandum Opinion.

Entered this 13 day of July, 2020.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge